Thank you, Your Honors. Good morning, and may it please the Court. My name is Kate Stetson, representing Coldwater Creek. Can I set aside five minutes for rebuttal, please? Yes. You have a clock there, and I'll also try to look and help you. Okay. Thank you. We've raised a number of issues in our briefing, but in the time we have this morning, I'd like to focus on what I think are the three predominant legal issues. Issue number one, of course, is the thin copyright question, whether the court erred when it instructed the jury that the jury need only find substantial similarity. Issue number two of law is the trade dress question, which is whether the court committed error when it instructed the jury that it could find, for the defendant on the trade dress question, if it found secondary meaning, without separately instructing the jury that if a trade dress is generic, there is no protection, full stop. The third issue, of course, is damages, which is whether this expert for Brighton correctly put in front of the jury relevant data and supported his theories of damages with substantial evidence so that the jury, in a lost profits case, could have some clarity and satisfaction that the damages it awarded were actually within some reasonable approximation of damages. So taking it from the top on the copyright issue, it's the law of this court, Harper House and Apple and Mattel, that unoriginal elements of a work are not protectable. So the question in this case is when you have a silver heart design where all of the individual component pieces of that heart themselves are concededly not original and not protectable, what you have then is what this court calls a thin copyright. The copyright exists. The work certainly is protectable. There was a Brighton designer who designed this heart, and there was a copyright conferred on Brighton for this heart. But the question is, outside of that particular selection or assembly of elements, how far does the copyright extend? And what Harper House and Apple and, to a certain extent, Satava versus Lowry teach, it teaches that in order for another work, another silver decorative heart, to infringe, that silver heart has to look virtually identical to the heart that has the copyright protection. I think it really depends on how you read Apple in these other cases, because as I read them, the question is if you have unprotectable elements in and of themselves, but you put them together and you have a compilation, then you have to figure out, well, with that compilation, how many different ways might one do that? Is there just one way, like a sky vodka bottle or something like that, a tile or something, some of the other cases the court has looked at, or are there multiple ways? So it's not simply because you have unprotectable elements that are put together doesn't mean you move to the virtual identity standard. So I'd appreciate your response to the argument of Brighton, which is, well, there's, I think they use the word gazillion because it's been used in one of the cases. There's a gazillion ways you can make these fanciful hearts and doodads and other things that go with them. So what is your response to that? Well, my response is I think Brighton is over-reading Mattel. The gazillion phrase comes from Mattel, of course. And what Mattel relied on for this notion of the breadth or narrowness of protectability was page 1139 of Apple. And I commend it to you specifically because this is what the Apple court says. When the range of protectable and unauthorized expression is narrow, the appropriate standard for illicit copying is virtual identity. So we're talking about circumstances where the range of protectable expression, emphasis on protectable, is narrow. How many different ways can this expression, this combination, be carried out? The standard is virtual identity. There's a little bit of- Why do you say that there's a limited number of ways? Given you've got a heart shape, but it seems to me there are lots of things you can do with a heart shape. Why is a heart shape different from a doll face, for example? There are certainly a number of different things you can do with a heart shape. And if you look at record excerpts 236 and 237, this is the conversation that Coldwater's counsel had with the designer of the Brighton heart. And what she says, I think, is telling and very instructive on the legal issue here, which is this is my heart. I designed it. There have been elements of roping and flower buds and scrolls all throughout silver design for decades, if not hundreds of years. In fact, in design generally, these elements are common. If you look over to the left, you see roping on the plaster. If you look above your head, you see scrolls. If you look to the right, you see chevrons. What the designer of the Brighton heart did was to take all those elements and put it together. That's her work. But it is only copyrightable to the extent that if someone comes along and makes a heart that is virtually identical to that heart, then copyright is infringed. Not beyond that. I'm sympathetic to your argument. I mean, we're having to do things in words. But, in fact, we're talking about something visual. And to what extent can we kind of cut past the words to the underlying purpose of these tests, which I think in this context really is that someone looking at one heart thinks that he or she is really looking at the same heart when he or she is actually looking at the other one. And if you put things side by side, okay, one has little dots and the other one has ropes. The chevron shape in the middle of the heart is a little different from one to the next. I understand that. Virtually identical doesn't quite capture the notion of is the average or even the attentive viewer seeing one without the other one immediately to the side going to be confused. It's true, just starting from your comment about words having sort of a limited function. When we're dealing with, in the end, we're dealing with something visual. True. And I'd emphasize, too, that it's difficult even on this paper record to appreciate what even Brighton's heart designer and the chief marketing officer conceded were differences between these two hearts. You have, at Record Excerpts 271, a concession by Brighton's chief marketing officer that these two hearts are not identical. Of course they're not identical. If that were the symbol or if that were the standard, you might have had a different result. Yes. As far as their being identical. I think that's right. And just as an aside, I know this court was interested in discussing the harmless error question with respect to civil jury instructions on either jury instruction that is the main focus of these arguments, either on thin copyright or on trade dress, which we can discuss later on. It plainly was not harmless error, in part because of that very testimony. Apart from the general cases that talk about the thin copyright, the virtual identicality, is there any case that you can think of that most closely approximates this amalgamation that is the heart in this case? I think the best case, Your Honor, is actually the very thorough Walker and Zanger case out of the Northern District of California. I'm choosing that because I think it is a very detailed recitation of this Court's precedents. It's relatively recent. It's from 2007. It has to do with tile, which Your Honor mentioned earlier. And what it concluded on the copyright issue, it's actually instructed on both copyright and trade dress. But on the copyright issue, what it said was there is, with respect to a few of these tile designs, not all of them, some modicum of originality that was brought into a sort of public domain or common tile design. But the copyright is thin because it only extends to protect that originality. That, I think, is the most apropos comparison to a product. But, of course, in copyright law, originality doesn't have the same meaning that it does, for example, in patent law. Originality means I didn't copy it from him. Right. As opposed to that I dreamed up something so totally unusual that no one else had dreamed it up. I mean, you don't need that kind of originality in copyright. Correct. So that's why, again, the words, sometimes we run into the problems with the words when we're really talking about visual depiction. So it is original in terms of what was put together. The question is, because it was not copied from another source directly, the question then is the degree of protection from virtual to substantial. Right. And I guess I'm looking for some other products or designs that might fall in this category. Sure. Well, in addition to the tile design out of Walker and Zanger, you have some rug designs in the Tuthankian case out of the Second Circuit. But I think probably most apropos to the compilation question we're confronting here is Harper House, in addition to Apple, which we've discussed a little bit. The Harper House is the case involving the organizer. And what the Ninth Circuit concluded was that in a case where you have, standing alone, unoriginal elements, and Judge McEwen, you're certainly right that unoriginal means something different in copyright law that it doesn't patent. It doesn't have to be new or novel. But when you have unoriginal elements, the assemblage of those elements, the compilation, is what is protectable and is the only thing that is protectable. What the Brighton silver heart designer here created was a protectable design, but it was only protectable as to her design. As she says in her testimony, this is my heart. I put it together. The fact that other people have used roping or chevron or flower buds or scrolls or dots or hearts is irrelevant because it's her design that's copyrighted. But the flip side of that is that it's only her design that's copyrighted. And the reason, going back to your question, Judge Fletcher, about the reasons behind this kind of constraint that we put on visual design, I think the court's earlier precedents and those from the Second Circuit, which appears to be kind of a hotbed of its own copyright litigation, the reason for this has to do with the notion that particularly when you're talking about design of products and you're talking about a copyright or a trade dress, which can be forever, you want to be very careful not to fence off from other designs, other innovations, even competition, the core elements of any particular industry or trade. The fact that this heart was made out of elements that are common in this industry, common in silversmithing, is itself too broad an idea for them to fence off anything other than the heart that Brightman designed. Could you move on to the trade dress issue and the jury instruction referencing generic? Sure. The jury instruction referencing generic, the reason it was faulty has to do with what the instruction did not say. And this is at Record Excerpt 117, and here's what the judge instructed. A generic mark or trade dress without secondary meaning does not receive trademark protection. And then there's an example of a generic word, which of course is hard, as you said, Judge Fletcher, to translate over to visual protection. A product design is generic if it is so common that it cannot be identified with a particular source. A claim of trade dress for a product design requires proof of secondary meaning. That was legal error. What the court should have instructed the jury and what Coldwater Creek sought for the jury to be instructed was that a generic trade dress does not receive protection, full stop. Now, here again, we run into some different strains of nomenclature when it comes to the question of explaining what is generic in trade dress. When you have a trademark, when you have a word, it's relatively easy to explain, and the court explained to this jury what a generic word is. You can't trademark the word hamburger because it's too generic. With trade dress, the question is a little bit different. And the question as courts to have explored this issue and described it is, are you trying in your claim of trade dress elements to, again, I'll use the phrase fence off too many things to your own intellectual property protection? So here, if you look at our record excerpts, there is a description in the response to interrogatories about what exactly were the elements of trade dress that Brighton was claiming. And the elements of trade dress were a silver heart in conjunction with two or more of the following elements, including cowhide or leather or brocade or other silver hearts. At various points in the trial, you had Brighton witnesses talking about how the trade dress also had to do with black or brown leather or braiding. But at the bottom, there are two separate issues here. The first, on the jury instruction, Your Honor, is none of that collection or assemblage of elements gave the jury any close instruction on what exactly the trade dress was that was claimed. And the elements themselves, getting back to the generic point, are utterly common in this industry. Leather, brocade, braiding, colors, if you want to throw that in, which didn't appear to be part of the trade dress except in a couple witnesses' testimony, silver. I wouldn't go with colors, whether they argued it. But, of course, we know that those can be descriptive. They can acquire secondary meaning. True. So I don't think that those are unprotectable in the trademark world. I guess my problem, which I will also discuss with Brighton's counsel, is the suggestion that in the jury instruction that you can have secondary meaning on top of a generic mark or a generic trade dress, which I think, speaking only for myself, not the panel, but I think that misstates the law both from the Supreme Court and the Ninth Circuit. The question I have is, well, then what? Because looking at the closing arguments and even trying to parse through the testimony, it didn't seem that it was really argued, well, look, this really is generic, so don't even go there, jury. And so I'm wondering if it might be harmless error in the scheme of things. Let's just assume that the jury instruction is legally mistaken or in error. Sure. And I do agree with you, Judge McKeown, that when it comes to the instruction from this Court and the Supreme Court, it's simply not the case that you can leapfrog over a generic misdetermination and find secondary meaning and rescue a generic trade dress. But as for harmless error, you know, the jury was not instructed on whether or not this trade dress was generic. And what you do have in the record are persistent attempts, I would say, by Coldwater's counsel to establish with each of the witnesses who spoke about trade dress what exactly the contours of this trade dress were and how they were limited. And if the jury had been instructed on genericness and the lawyer had been permitted to argue genericness as a threshold cutoff to any further discussion of secondary meaning or customer confusion, I think you would likely have had a very different outcome. That, of course, isn't even the standard. Under the two cases that your order cited, Gambini and Kennedy, both of which dealt with the harmless error in civil jury instructions, the question is if there is any evidence to support the notion the jury could have found your way if you're the aggrieved party asking for an instruction you didn't get. Now, in Kennedy... Could this... Let's assume it's an error and you're just walking down that path. Could this court determine that as a matter of law, the trade dress is not generic and therefore that is a harmless instruction? Your Honor, I think the question of whether something is or is not generic is something that should be put to the jury. I think it can be... Well, it's usually a question of fact. Right. But you can still have summary judgment on things that are questions of fact, where there's... Exactly. Where you make a... Like, here's all the facts. What's the legal judgment? You're certainly right that you can, even in a fact question, have summary judgment granted. But I would submit that in this case where the court went off the rails in the jury instructions, it would be important to send that issue back for either the court in the first instance, which you will remember granted summary judgment only in part on the copyright and trade dress issues here, concluding that the rest of it needed to be sent to the jury. Well, let me ask you a related question. Let's just assume that the damage was upheld and then it went... And let's assume it went back on the generic question, or I guess it would be the trade dress question. And let's say the jury... And it said, you know, you can't have generic trade dress, but if you show that you're at least descriptive or above and get secondary meaning, you're in the pink and you can keep going. And the jury came out in favor of Brighton. Would you need to have another damages trial or would you be able, if there were no error in the damages, to stick with the damages? Assuming the exact path that you set out, which is that the same trade dress is in play, which of course is a difficult question to assume because the contours of the trade dress are ill-defined, and the same, therefore, number of products are in play, you probably could not take away some increment of damages based on that subsequent verdict from the way that you've laid it out. But let me on that point get quickly to the damages issue, because I know I'm running out of my time. The damages issue, I think, is most plainly brought forward by Brighton's expert Wunderlich's own testimony, and you can find it in excerpts of record 274 to about 286. And I want to focus you on two particular strains of argument that Mr. Wunderlich offers. One of them has to do with what I'll call the lost sale theory, which is for every cold water sale, Brighton lost a sale. And you can find that most plainly at record excerpts 276 and 278. Brighton lost 115,000 opportunities to sell its products. That is the data predicate for what Brighton is now describing as its actual damages theory, which is what Brighton calls its lost customer theory, which is because cold water was selling less expensive bags, certain Brighton customers walked away from Brighton, never to return again. The problem is that both in his expert testimony and in counsel's closing argument, the basis for that theory was the cold water sales, the 115,000 cold water sales that led in turn to this 1.7 multiplier that we discuss in our brief that led in turn to a damages award. Now, the problem is, as this Court has pointed out in the Polar Bear Productions case and the Murphy Tugboat case before that and several others, it's certainly the case that you don't need to show lost profits. You can't with any mathematical certainty. But what you do need to show under Polar Bear Productions is that the calculation was based on relevant data and supported by substantial evidence. The problem here is that essentially the expert was supporting one theory with data drawn from another. So just by way of analogy, if you want to find out, you know, the total amount of tuition paid to USC, you don't start by asking how many students there are at UCLA. That's in essence the problem. Could you not give the analogy but tell me precisely what his mistake was because I'm not sure I understand it yet.  His mistake was in importing the cold water sales, the 115,000 cold water sales as a predicate for brightness. What do you mean by predicate? If you look at page 276 to 278 where he gets into this theory exactly, what he describes is that he's taking this number as what he calls a convenient assumption, a one-to-one correspondence between cold water sales and brightness. But then he starts playing with that number a little bit. He says, well, on the other side of my theory, the lost Brighton customer theory, if you take this number and you divide it by, he says, six or seven, you get 20,000 Brighton customers. And that certainly seems like a good estimate for customers who would have walked away from Brighton. Let me cut to the chase, if I may. As I read your brief, you were saying this one-to-one theory didn't make any sense because the price of the Brighton product was so much more than the price of the cold water product. And to assume that if someone buys a cold water product purse, that that same person would have bought the cold water purse is ridiculous, which I think is quite right. But that wasn't his theory. His theory was this is a knockoff. People buy Brighton products in part because it's special. And if they see people walking around with purses that are very similar and easily confused that can be bought very cheaply, the fun or pleasure of having bought an expensive product disappears, and so the sales fall off. So those are two very different theories. They are. But that's the problem with Dr. Wunderlich's data, is that in order to support your theory, you're exactly right. I don't have a theory. The theory you're describing, I should say, the lost customer theory. Right. What Wunderlich did was to take the cold water sales as a predicate for his lost customer theory. Now, there's other ways to do it. If you look at a lot of the damages cases, the lost profits cases that are cited in Brighton's own brief, you will find, in essence, a recipe for how to establish lost profits. You look at market data. You look at comparable products. You look at, depending on the sort of case you're talking about, you look at other types of forecasts. You look at consumer purchasing data. The problem was that if you examine Wunderlich's testimony, he was borrowing data from that lost sales theory, the forever cold water sale, Brighton lost a sale, which should now disclaim. And he's using that as the starting point for his lost profits theory. But I don't read his testimony as saying the lost sales are because of the sale of the cold water product in the sense that this customer would have bought Brighton if that customer had had available side-by-side a Brighton and a cold water. I just don't think he's saying that. No, I don't think he... The question is, does he have enough basis for figuring that this is the number that of lost sales by Brighton based upon, as it were, the diminution of the brand value? And that is exactly the question. And what we're saying, what we argue in our brief, and I'm suggesting to you here, is that if you take as the starting point from the old Supreme Court Bigelow case, from this court's polar bear productions case, that you need relevant data to support a lost profits issue. You can't draw that data from another theory and start massaging it and importing it into your theory. There were other ways that... I guess the question, your bottom line is that you think that the data he's using is the wrong base for the theory that he adopted. Yes. I mean, it goes back to my relatively simple, but I think apropos UCLA-USC analogy. If you're out to calculate or monetize a certain element of UCLA's tuition, you don't start with USC's undergraduate student base. So to here, if you're out to monetize or even approach a reasonable estimate, which is all this court's precedent's demand of Brighton's lost profits, you don't start by estimating cold water sales. You estimate exactly what Your Honor Judge Fletcher was talking about. You ask yourself, based on market data, based on statistics of Brighton's sales of these products, based on comparable industries, and these are all ideas that I'm pulling from lost profits cases in the past. What can I demonstrate, I, Brighton's expert, about the diminution in sales at Brighton because of cold water's infringement on... All right. I think we'll hear from Mr. Ross now. Very good. Thank you. Good morning, Your Honors. Peter Ross for the respondent, Brighton. I'm going to start out with the genericness issue. In the Walmart case, the U.S. Supreme Court discussed the requirements for proving that product design trade dress is protectable, and the court concluded that the plaintiff, in such a case, must prove secondary meaning. U.S. Supreme Court didn't discuss genericness as an additional requirement. No. What I think the Walmart case and the others say is you don't, with product design, you no longer can get yourself in that upper category of trademark hierarchy. Yes. But instead, you must prove secondary meaning, but they did nothing to take away what, at least I have understood for many years, to be the bottom line, which you can't have trademarks on something that's generic. So I don't know if our difference in view comes in a difference in reading Walmart, or you have another case that says you can put secondary meaning on top of a generic mark or trade dress and still get a protectable item. I understand what Your Honor is saying, and this is my response. I think that given what the U.S. Supreme Court said in Walmart, and thinking logically about what genericness is, there's no need for an extra requirement of genericness. It would be superfluous. A generic product is, by definition, one that's incapable of acquiring secondary meaning. A plain baseball bat with no markings on it at all. Whose bat is it? A white shirt like the one I'm wearing with a collar and a single pocket on the breast and cuffs and buttons. Whose shirt is it? A leather handbag without a single embellishment on it. Who made it? No one would know. It's generic, and it can't possibly acquire secondary meaning. We don't really need it. See, now you're saying what I think I'm saying, but that's different what you started with. Here's the jury instruction that bothers me. A generic mark without secondary meaning does not receive trademark protection. So what that says to me is if you can get secondary meaning, even if you have a generic mark, then you get trademark protection. So that specific statement that found its way into the jury instructions is a fairly critical situation. I know there was some discussion about it. You see that in the record. But why isn't that a legal error? I understand the court's point on that. That statement itself is confusing. The rest of the instruction goes on to accurately describe genericness, and I think that no jury would be capable of finding secondary meaning were they faced with a generic product or generic trade dress. Well, the problem is it tells them they can do that. It says, you know, you need secondary meaning if you have generic mark. Then it tells you what the generic design is. And then it tells you that if you have trade dress in your design, you need secondary meaning. So basically it tells them, you know, now I go to the secondary meaning instructions and see if they pan out. I think as a matter of logic, the jury simply could not have found secondary meaning if it really found there was a generic trade dress. But let me talk about harmless error. The lessons of the Gambini and Kennedy cases seem to be that the failure to give an instruction or an instruction given is harmless error where no reasonable jury could have found for the other side had the instruction properly been given. Here, I don't think any reasonable jury could have found for cold water even had a different instruction on genericness been given. Brighton's trade dress bags are clearly not generic. We can look at them and see. They're highly embellished. They have a distinctive brocaded fabric on them. They have embossed leather trim. They have sculpted silver parts and braided handles. It's just not a generic item as a matter of law. To answer... How did this get in there? I'm going to try to figure that out. I think that that instruction got in there because cold water was requesting that the court say something about genericness. And the court was having a hard time reconciling that request with the Walmart case in the absence of any generic requirement. So the court crafted an instruction. And while it was being crafted, cold water actually never spoke up and said anything about it one way or another. So the actual drafting of inserting generic mark into instruction 19 was done by the judge? By the judge in open court. And there was no objection by cold water? That's my recollection. I believe that's what we say in our papers. Well, I guess if your recollection is wrong, we'll hear about it. I guess when I read that, I thought that they were asking for a statement. We want to have the jury make sure that it's not generic. And then my problem here is I read Judge Huff, who's a very capable judge, somehow seemed to get crosswise with the Walmart case in some way and then came up with this. And I was trying to go through the transcript here to figure out how this is really happening in the jury instruction conference. So it just seemed like what cold water asked for were generic. Well, they asserted the offense of genericness, and they said that you should have the burden of showing that your trade dress is non-generic. So they wanted an instruction to that effect, sort of a baseline instruction before you get to secondary meaning. But the court didn't give that. So they, I mean, they, I guess the court said all the instructions they asked for were assumed to be objections, right? Is that how, I mean, that's how I read the transcript. You didn't have to object again. Everything you asked for that didn't get given is an objection. Yes. So the way it worked is this, to my understanding. They were requesting the genericness instruction. Judge Hopp, who is a very careful and good judge, was sitting there in open court and started to draft this thing. There was colloquy between Brighton's counsel and the judge. Coldwater's counsel doesn't object, and this instruction is settled upon and given. And we described that in our respondent's brief. And in the reply, Coldwater says, yes, but we objected because we proposed other genericness instructions that were not given. So, as I would analyze that, their objections were to not giving the other instructions, but no objection was raised to this instruction, which was passed in court. One of the questions is, you know, usually genericness is a factual issue. So if this instruction is wrong, just assume for talking purposes that this instruction is a legal error, and normally genericness is a factual issue, why wouldn't the jury have to go back and determine that? Because of what I was saying just a moment ago, which is that I think we can all look at it and say this is a highly embellished bag, and it's certainly not generic, whatever else one may think of it. It's very distinctive, and it's just, in comparison to my white shirt, in comparison to a baseball bat with nothing on it, in comparison to a plain leather bag with two leather handles, that would be generic. Well, where would you place, in your view, where in the trademark hierarchy do you place the Brighton compilation? Oh, well, given Walmart, we really don't have much of a hierarchy. So it would be descriptive at best. I think that's, well, it doesn't even... I know you don't want it to be generic. No, it doesn't even apply, really, descriptive. I mean, if we were using that hierarchy, it is inherently distinctive. That's how people recognize it. Coldwater itself was asking its designers to come up... Now you're merging that with secondary meaning, aren't you? Well, no. Coldwater itself was asking its designers to come up with a bag with a Brighton-y look. There was testimony from Monica Bolin, who is the retail store owner in Michigan, that she was selling a knockoff line, and people came in every day and said, isn't that Brighton? Are you selling Brighton? There was testimony that people saw their ads and thought, why is Brighton selling their bags now in Coldwater Creek's catalogs? All these things show that the trade dress is distinctive, that it really is something people can look at and say, hey, that's a Brighton bag. To give another analogy, the plain leather bag with nothing on it, two leather handles, that's generic, but you just add some cross-hatching quilt pattern and a metal link handle on it, and people are going to recognize that as a Chanel bag. I've now created a Chanel bag. It's clearly not generic anymore just by adding the quilting and a metallic chain link handle. It's embellished. People can recognize it. In their own market, Brighton sells $300 million, $400 million a year of product, and people love it. They collect it. On average, the testimony was, a Brighton customer owns about 10 to 12 Brighton accessories. They buy, what, 1.7 things when they come in? They come in, the store data shows that they buy 1.7 things every time they make a transaction. So it's distinctive, and I don't think there's any question about that, and I think the summary judgment analogy is a good one. We can all look at these bags and say whatever they are, it might not be your taste, but they're certainly not generic. I mean, I have to say I'm not an expert in bags or purses, but it's hard for me actually to see any bag that's actually on the market as generic. Having a very simple bag with no embellishment is, in fact, a design choice, and it would stand out in the market as well. I mean, I have trouble understanding that it's very likely that any bag being sold would, in fact, be generic. That could well be the case. And it's funny that I am a handbag expert at this point in my life. I bet. There was one other question that Judge Fletcher asked, I believe, earlier, which is if the case is remanded for a determination as to whether the bags are generic. No. Okay.  But we do look alike. I'm sorry. We wear the same. We do have a generic dress, I would say. Would there be any reason to retry the damages? And I don't think there would be any reason. If the jury decides this bag or these bags are generic, which I'd find impossible to believe, then no damages exist and the case is wiped out on trade dress. And if the jury determines that the bags are not generic, which I think would have to be the result, the damages have already been determined from these very bags. We don't have to retry that case either. Do you want to talk about the damages? Okay. In my view, the damages depend on whether we really believe in the Story-Parchment case. It's a 1931 Supreme Court case, but it's never been questioned or overturned. And basically it says that the fact of damage must be proven with reasonable certainty. And if the fact of damage is proven, then the amount can be left to the reasonable estimation of the jury in the U.S. Supreme Court notes. Yeah, but that just gets us started. Okay, so what's a reasonable estimation and what's a reasonable basis for the Brighton expert to have informed the jury as to what his estimate was? Okay. And I am somewhat sympathetic to the argument from the other side that it's hard to figure out the damage to the brand as a kind of a one-to-one for every bag sold by Coldwater that is a violation that cost them the sale of one bag of their own. I mean, that might be right, but it might be right only because it's a coincidence. Okay. Let me address that. But before I do, I'm just going to say one more sentence about Story-Parchment, which is that the court stated that its holding was particularly applicable in antitrust, copyright, and trademark where damages are hard to pin down. Sure. So here we have the fact of damages. Their expert admits it. Our expert says it. Their expert, Ellen Goldstein Lynch, said that where you have the sale of cheap knockoffs, those harm sales of the authentic brand. So essentially, if we have cheap knockoffs being sold, the experts on both sides agree there is the fact of damage. So what did the jury have to go on to reasonably estimate the amount of damages? They were given, among other things, the following evidence, that these knockoffs appeared in 120 million catalogs distributed throughout the United States and in hundreds of retail stores across the country, that by Coldwater's estimate, over 50 million Americans saw these knockoffs. That's one out of every five adults in this country. Saw these knockoffs either in the flesh, as it were, or in the catalog. Yes. Did not necessarily see the real item. That's right. But a huge number of people saw these knockoffs. It's a big, powerful company, and they were out there using their entire marketing power to show these knockoffs to the country, and they did a good job of it. Brighton has over 2 million customers, and on average they buy 10 to 12 Brighton accessories apiece unless something happens to turn them off. So given all that, the jury found that 13,000 Brighton customers would be affected by this. That's less than 1% of the Brighton customers. And by the way, it's significant. But so affected they would never buy from Brighton again. Yes. I've got to say, it strikes me as a house of cards. I just don't understand where the numbers come from. There's no connection between the number of viewings you've identified and the results that are purportedly estimated because of it. Well, the jury, in my view, was entitled to take these facts. Well, they didn't take facts. They took testimony from an expert who acknowledged it was a convenient assumption but pushed a lot of numbers forward that I simply can't find a logical foundation for. I mean, I understand the relationship, but even that's not clear. The fact that something is ubiquitous doesn't mean that it's not popular. Indeed, ubiquity means there's a lot of popularity. And the fact that things are seen doesn't mean they're seen as knockoffs. It may seem that, oh, this is the bag we're supposed to go out and buy. So I'm just kind of adrift. I understand that the fact of damages is the critical determination, and I'll accept that you've got that here, but I have a real problem coming up with a number based on what was offered up. What Your Honor is suggesting is exactly contrary to what the experts on both sides concluded, which is that if you have cheap knockoffs out there. But you haven't told us that. You've told us that people have seen things. That's not the same thing necessarily as having cheap knockoffs out there. I mean, I accept the proposition. There are cheap knockoffs out there because there are counterfeit Louis Vuitton bags. Louis Vuitton likely suffers in some fashion. That's fine. But the damage award is a precise figure, and I just can't figure out what it's based on. Well, the fact that the cheap knockoffs are out there, and they are. These bags were selling for about one-fifth the price of the Brighton bags. The effect, and this is described by the experts, is that women no longer believe that the Brighton bags have any cachet. That's the effect that was described and that was in evidence. The difficulty I have, and maybe you can help me, is I feel like I have this constellation of unconnected numbers or facts. And normally in a damage theory you construct a theory that kind of runs from one presumption through. And as Judge Fletcher said, there's so much mixing and matching here. So I feel like, well, yeah, there's definitely damage if it's a knockoff. Lots of people saw it, do have damage. You have this many customers, we sold this many things. It's like all this is floating around and there's not a coherent damages theory. And that's where, once you have a fact of damages, our cases suggest it can't be speculative. And that's where we're struggling with is how to move what can't be totally precise from being speculative. And that's kind of a little bit of a niggling feeling I have, and I don't know yet. I mean, it's a complicated thing, as you've explained, and there's definitely damage. How do you connect up these almost unrelated facts? I think that's where one has to give story parchment its due, saying that an antitrust copyright and trademark where the fact is proven, and these are the words of the Supreme Court, where the defendant assumes the risk that some estimation has to be made of what the amount of damage is. But the estimates can't be, at some point they cross to speculation, correct? I mean, in other words, what that case is saying, if you've got damage, you don't need absolute precision to get a damages number. But that intersects with our other cases, which also say you can't speculate. Do we have evidence in the record, for example, that shows sales of other Brighton products going up, and the sale of the Brighton handbag at issue going down after the appearance of the Coldwater handbag? Yes. And what do those numbers tell us? I don't have those numbers in mind, but they're in the record, and that's exactly what happened. And I would point out... But that's not the basis for the damages theory, is it? No, it's just another basis for saying... Seems like that would be a good basis. No, but it seems to me that's exactly the basis for the theory. The theory is that as soon as these Coldwater bags come on the market, that diminishes the appeal of the Brighton bags, and that then costs sales. That's the theory. Yes. That's always the theory. Yes. And the question then is, what data do we have to back it up? And it sounds as though if we have other Brighton products continuing to go up, and this particular Brighton product may be one of not very many Brighton products beginning to have trouble more or less coinciding with the appearance of all these Coldwater bags, that's helpful. And you say there are numbers in the record, but you just don't know what they are? I don't know what they are. And I guess what I'm saying, just to understand, is I think that Judge Fletcher has laid out what would be a logical damages theory. My question is, were those numbers, the falling sales numbers, or the delta between what used to be, was that part of your damages theory? That wasn't part of the calculation. It wasn't part of the calculation. Okay. So there's numbers, but they didn't kind of find their way into the big arithmetic. Let me just make a couple, yes, that's right, a couple quick points on this. The jury did not agree with Mr. Wunderlich's numbers. The jury found something less than Mr. Wunderlich proposed. But you've justified that by saying it's within the range he offered up, so it's okay. Yes. And if the range he offered up has no foundation in reality, or we find it to be purely speculative, the fact that they found a number that's within the range doesn't tell us anything. It doesn't give any confidence in the number the jury came up with. That is a reasonable point. But the number that Dr. Wunderlich came up with and the number the jury came up with is a very small number, making an assumption that some number of people are affected, and the experts on both sides agree. And are so affected they'll never buy another Brighton product. That assumption I have additional difficulty with. I mean, my mother was a big shopper from these kinds of products, and some products she liked and some products she didn't. The notion that there's a bag that's similar to a Brighton bag causes her to never buy another Brighton again is just one that isn't my radar screen. Well, let me move a little bit away from that exact analogy. There could be some people who never bought again, and there could be other people who stop buying for the next five years because they feel put off, and there could be other people who don't buy for the next year because they feel put off. And we're just trying to come up with an estimate of how many people there would be. Usually when you do that, the expert actually has some expertise in counterfeiting, and there are studies that show effects of counterfeiting on consumer behavior. So when you do that, you take some percentage, you take the numbers, you apply it. I'm still having this trouble where we have all these. You have, like, some great facts, but I'm not sure how they get glued together. Yes. And so what was the purpose here? You have in the actual damages, you also have the alternative of Cool Water's profits. In copyright, one can recover the profits and the actual damages. Right, and then you have that on the trade drafts as well. And in the trade drafts, the jury found numbers for the profits and actual damages. Correct. But we were awarded as part of the judgment just the actual damages. Just the actual damages. You chose the damages. You chose, obviously, it's a much bigger number. Yes. Right. So I guess the purpose of that is if they found no actual damages, but they found some significant profits, you could have taken the profits. That's right. Okay. So on the damages, I think there was enough for the jury that they were given that they could use to make an estimate that was reasonable. I think I'm out of time. You are. Thank you. I appreciate your argument. Ms. Dessen will give you two minutes for rebuttal. Thank you, Your Honor. Thank you. Thank you, Your Honors. A couple of quick points. To your questions just now about what you described, Judge McKeown, as the constellation of data out there. I think it's correct that there is some data in the record supporting the idea that there may have been a basis for a legitimate and substantiated lost customer theory. The problem is the theory at Record Excerpts 274 to 286 that Wunderlich put in front of the jury, and the theory at Supplemental Record Excerpts 1771 that Counsel for Brighton reiterated to the jury in his closing argument is that the loss of 115,000 transactions under these circumstances seems conservative. But, Judge Clifton, as you pointed out, the fact that the number of hypothetical lost transactions seems small in comparison to other Brighton transactions is irrelevant if it's not based on some relevant data to the inquiry. If you're starting with the wrong number, the fact that you're ending up with a number that looks reasonable is meaningless. So on the damages point, I would essentially see Counsel's story parchment and raise him polar bear, Murphy tugboat, parlor enterprises, which is the case where Wunderlich's theories were knocked back by the Court of Appeals in a jury verdict over time. Quickly on generic, if you look at page 147 of our Record Excerpts, you will find, Judge McEwen, as you pointed out, our argument that the Court had omitted an important instruction. And it was the instruction that the plaintiff in a trade dress infringement case bears the burden of showing non-genericness. Now, to the question about whether in the hypothetical event the jury had been presented with that instruction and had been asked that predicate question, has the plaintiff proven non-genericness, whether the jury could have found these items generic, I would point you to what I think is an instructive quote from the Yerman Designs case, which is a relatively recent case out of the Second Circuit. Without a specification of the design features that compose the trade dress, different jurors viewing the same line of products may conceive the dress in terms of different elements and features, so that the verdict may be based on inconsistent findings, where you have, as in this case, a recitation throughout the trial of a number of different combinations and permutations of trade dress. And you just heard another one today from Brighton's counsel, braiding. Braiding was not part of the trade dress that was claimed in the interrogatory responses. It's going to have to be put to the jury whether that trade dress, in combination or in multiple combinations, was so broad and so over-inclusive that it essentially threatened, as Yerman described it, to fence off a part of the product market that is incredibly common in handbag design. So with those points, if there are no further questions, I will submit. Thank you. I'd like to thank both counsel for your arguments today. Very helpful. And we'll now adjourn Brighton Collective Order, which is Co-Order Creek is submitted.
judges: McKeown, Fletcher W. , Clifton